ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* TOUHEY.

Opinion delivered December 2, 1899.

1. MASTER AND SERVANT—VICE PRINCIPAL.—A yard foreman, having control over a switch crew, with authority to report them for neglect or refusal to work, but without authority to employ or discharge them, is, as to the members of such crew, a vice principal, under act of February 28, 1893, providing "that all persons engaged in the service of any railroad corporations, foreign or domestic, doing business in this state, who are entrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporation, or with the authority to direct any other employee, are vice principals of such corporations, and are not fellow servants with such employees."   (Page 213.)

2. CONTRIBUTORY NEGLIGENCE—EMERGENCY.—In an action to recover for the killing of plaintiff's intestate in a railway accident the court properly instructed the jury that if they believed that, at the time intestate "jumped from the car, the appearances of danger to him were sufficient to justify a person of resonable firmness and prudence in believing that his safety required him to jump from the car in order to escape the impending danger, then the fact that his death resulted from injuries received in making such jump will not defeat the plaintiff's right to recover in this action; and this is so notwithstanding that the jury may further believe that deceased might have escaped unhurt, had he made no effort to leave said car."   (Page 215.)

3. MASTER AND SERVANT—RISKS ASSUMED.—While an employee assumes all the risks ordinarily incident to the service he enters, he does not assume a risk created by the negligent act of the master, and only such risks as he knows to exist, or may know by ordinary care.   (Page 217.)

14

4. NEGLIGENCE—MOVING DAMAGED CARS RAPIDLY.—Evidence that, while a wrecked car was being moved at the rate of five or six miles an hour, an employee riding thereon under the supervision of a vice principal was killed in a collision between the car and a semaphore pole standing near the track, and that there was reason to apprehend that the car would careen far enough to strike the semaphore pole, is sufficient to support a finding that the railway company, through its vice principal, was guilty of negligence. (Page 218.)

Appeal from Lonoke Circuit Court.

JAS. S. THOMAS, Judge.

*Dodge & Johnson,* for appellant.

The instructions given for appellee, proceeding upon a theoretical case of *fellow-servant* or *vice-principal*, not borne out by the record, are abstract and misleading. 63 Ark. 684. The case is plainly one of assumed risk. Even if a *vice-principal* had been present, unless through some act or conduct of his he had relieved the servant of the duty to observe and protect himself against dangers, it would have created no liability. 59 Ark. 478. It is not the duty of a servant to obey where obedience will subject him to a *latent* danger. The second, third and fourth instructions for appellee are erroneous. The railway company was not an insurer of the safety of its machinery and appliances. 41 Ark. 392; 45 Ark. 324; 48 Ark. 463. The employee assumes the risk of all such dangers as are incident to the employment, open to his observation and with knowledge of which he is chargeable in the exercise of reasonable care. 46 Ark. 567; 60 Ark. 442; 48 Ark. 347; 79 Me. 405; 40 Ia. 341; 39 Minn. 523; S. C. 41 N. W. 104; 53 Mich. 125; S. C. 18 N. W. 584; 67 Mich. 632; S. C 35 N. W. 708; 81 Mich., 435; S. C. 46 N. W. 111; Bailey, Mast. Liab. 160; Wood's Mast. & Sev. § 376; 58 Ark. 178; 56 Ark. 237; 58 Ark. 338; 22 N. W. 221; 40 Ia. 341; 39 Minn. 523; 54 N. J. Law, 411; 42 Mich. 525; 122 U. S. 189; 27 Minn. 367; 2 Am. & Eng. R. Cas. 158; 56 Tex. 482; Pierce, Railroads, 379; 2 Thomp, Neg. 1009[15]; 11 Am. & Eng. R. Cas. 201; 52 Mich. 40; 33 Mich. 133; 45 Mich. 219; S. C. 7 N. W. 791; 49 Mich. 466; S. C. 13 N. W. 819; *Id.* 184; 62 Ia. 629; 21 Am. & Eng. R. Car.

593; 139 Mass. 580; 79 Me. 397; Beach, Cont. Neg. § 138;
140 Mass. 201; 31 Am. & Eng. R. Cas. 281; 6 S. W. 434;
54 Ark. 394; 2 Am. Neg. Rep. 578; 27 Minn. 367; 34 Minn.
94; 41 Minn. 289; 47 Minn. 361; 35 S. W. 260; *ib.* 879; 37
S. W. 659; 94 Mo. 206; 86 Mo. 463; 77 Mo. 511; 119 Mo.
322; 40 S. W. 174; 66 Tex. 732; 72 Tex. 159; 78 Tex. 439;
86 Tex. 96; 35 S. W. 879; 68 N. W. 1057; Cooley, Torts,
522; Wood, Mast. & Serv. §§ 326–335; 2 Th. Neg. 1008;
McKinney, Fellow Serv. § 30; 47 N. W. 182; 63 N. Y. 449;
16 Atl. 280; 62 N. W. 624; Bailey, Master's Liab. 169, 170–1;
42 Neb. 793; 46 Neb. 556; 36 N. E. 44; 4 So. Rep. 701; 52
Ia. 276; 7 Atl. 284; 33 N. E. 510; 11 Atl. 659; 41 Ark. 542.
The verdict is excessive.  57 Ark. 378;  57 Ark. 320;  56
Fed. 250.

*Marshall & Coffman,* for appellees; *Trimble & Robinson,*
of counsel.

Signals are given under the rules of the master, and the
giving of them in this case did not affect the grade of deceased
as a servant.  36 S. W. 432.  Deceased was not guilty of con-
tributory negligence in acting upon the reasonable appearance
of danger and jumping from the car.  36 S. W. 491; 55 Ark.
248.  Deceased can not be said to have assumed the risk of
the negligence of his vice-principal.  Bail. Mast. & Serv. 264;
21 So. 440.  The knowledge which will defeat a servant's
right of recovery must be of the *danger,* and not of the *defect*
(53 Ark. 128; *ib.* 465, 467); and it must be a knowledge of
the *specific danger in question,* and not of danger *in general.*
42 Wis. 583.  On this point, and upon the general question of
assumed risks and knowledge of the servant, see: 19 Pac. 191;
18 N. E. 209;  9 N. E. 608; 16 Pac. 146; 42 Wis. 583; 31
Pac. 283; 49 N. W. 655; 30 Cent. Law Journ. 462 n.; 82 Fed.
720; 87 Fed. 849, 854; 41 N. E. 1037; 44 N. W. 884; 35 Atl.
305; 88 Fed. 44.  Under the circumstances of the case de-
ceased had a right to rely upon his superior's judgment and obey
his order.  40 N. E. 700; 27 Pac. 728; 104 Mo. 114; 58 Mo.
App. 27, 68.  The servant has this right so to rely upon the
master in all cases where the danger is not so obvious that no

prudent man would obey the order. 5 Rap. & Mack's Dig., Ry. Law § 435, p. 238, and cases; 18 L. R. A. 827; 17 *id.* 602 n; 14 Fed. 564; 96 Mo. 207; 129 Ind. 327; 2 Sh. Neg. 97 n. 5; 44 N. E. 876; S. C. 59 Ill. App. 32; 66 N. W. 271; 162 U. S. 93; S. C. 56 Fed. 700; 30 L. R. A. 814; 16 *Id.* 819 n.; 40 Mich. 424; 24 L. R. A. 717. The negligence of the vice-principal was in ordering the servant into a situation of danger. 45 S. W. 56; 5 Rap. & Mack's Dig., Ry. Law, §§ 435, 441; 23 N. E. 675; 27 Pac. 701; 12 Fed. 600; S. C. 17 *ib.* 67. The verdict is supported by the evidence and must stand. 83 Mo. 481.

*Dodge & Johnson,* for appellants, on motion for rehearing.

Where the defect or danger which caused the injury is patent, or is of such a nature that the servant can appreciae and see it at least as well as the master, the risk is one which the servant assumes. 150 Mass. 423; S. C. 41 Am. & E. R. Cas. 327; 157 Mass. 418; 32 N. E. 464; 112 Mo. 220; 20 S. W. 436; 77 Wis. 51; 45 N. W. 807; 31 Am. & Eng. R. Cas. 199; 103 U. S. 370; 17 Atl. 7; 17 N. Y. S. Rep. 715; 17 N. Y. 552.

*Marshall & Coffman,* for appellee, on motion for rehearing.

The danger was a latent one. 63 Fed. 530. The agent does not assume a risk which is not so apparent as to render his act imprudent. 40 L. R. A. 781–2, 788; 54 Ark. 389. The servant is not held to have assumed a latent risk, merely because he had equal opportunities with the master for knowing of it. 41 L. R. A. 130, 131.

BUNN, C. J. Thomas Dalton, an employee of the appellant company, was killed by the falling of a semaphore pole near its tracks in its yards in North Little Rock on the 6th of November, 1895, and the appellee, John W. Touhey, was appointed administrator of his estate, and brought this suit against the company for the benefit of the widow and children of the deceased, laying the damages at $15,000. The defendant answered, putting in issue all the material allegations

of the complaint. A jury trial was had, resulting in a verdict of $8,000 for plaintiff, and defendant appealed.

The allegations as to negligence in the complaint are as follows, viz.: "Plaintiff says that the defendant so carelessly and negligently caused and allowed its cars to be and remain in a defective and unsafe condition as aforesaid, and so carelessly caused and allowed its said semaphore pole to stand too near its track, and so carelessly and negligently, by and through its foreman as aforesaid, caused its cars to be moved while in such condition, well knowing the same, and his said intestate not knowing it, and in such a careless and negligent manner, as to cause the death of his said intestate, as aforesaid." In this there are two distinct charges of negligence; one in having the pole too near the track; and the other in permitting its cars to be moved as they were on the track in such condition as that in which they were at the time.

The first question raised is whether or not C. Streetor, the foreman of the crew in charge of the wrecked cars, was a fellow servant with the others of the crew, among whom was the deceased, or was a vice-principal to the company. The testimony of Streetor affecting the question is substantially as follows, viz.: He states that on the 5th November, 1895, he was engine foreman in the defendant's yards in North Little Rock; that there were three damaged cars brought into the yards at that time, and that he received a switch order between 9 and 10 o'clock that evening with regard to these cars, but that he could not tell [remember] from whom the list came. His switch crew consisted of Ryan, Harmon and Dalton, and the engineer Phillips, and a fireman whose name he could not remember; that these men constituted his switching crew in the yards, and were working under him. The duty of witness and this crew was to do any work needed in the yards, switching and moving cars, including damaged cars, to and from the tracks in the yard to the repair shops. That he did not have power to employ these men, and only reported them when they failed or neglected or refused to do their work. That all the crew saw the condition of the damaged cars, when they went to move them to the repair shops, and that he called his crew's atten-

tion, and warned them to be careful, so that no one might get hurt in handling them, for there were no drawbars on the ends of these cars, and one of them extended out on one side so far that it would not clear a car on the track beside the one they were on [that is track No. 11], the projection being about a foot [meaning farther than usual], caused by the telescoping of one car into and over another. That there were three of the damaged cars (two baggage and one mail car), and these were in a train,—first one of the cars, and then two, one in and on the other,—these making the projection, and all were pushed by an engine and tender behind. Witness had informed his crew that they were going to get the three cars and put them on No. 8 track [the repair track], and he said also that they had made room for these cars on this track before they went after the cars on the other track; that, as they were going up the main track, Dalton and the others of the crew were talking about the wreck in which these cars had been wrecked the day before, and asking how each would have felt had he been in it. In the midst of this conversation, which made all of them somewhat nervous, we infer, in view of the very bad condition of the cars upon which they were then riding, the foreman, Streetor, who was sitting on the front platform of the front car, told Dalton, seated on a step below him, to move and give him room as he might have to jump at any time. These two were on the side of the semaphore pole, and the others were on the other side and elsewhere.

From this testimony, which is undisputedly true, it is impossible to escape the conclusion that, in the control and management and running of these cars and the labor of this crew, Streetor was not a fellow servant with the others, but a vice principal. Under the old rule the principal test—the one most relied on and most frequently called into requisition—was whether or not the one employee had the authority to employ and discharge the others, and under that rule Streetor would have, very probably, been held to be a fellow servant with the others, for he says himself that he had no power to employ or discharge the others of the crew. But, even before the passage of the "fellow servant act," this court, in the case of *Bloyd* v.

*Ry. Co.* 58 Ark. 66, had advanced a step towards abandoning the old rule, and made a test of the relation existing between servants and the master and servants quite different—a test quite in keeping with the spirit of the fellow servant act, which had already passed when the Bloyd case was decided, but had not been passed when the cause of action in that case accrued. The first section of the fellow servant act, approved February 28, 1893, and which governs the case at bar, reads as follows, viz.: "That all persons engaged in the service of any railroad corporations, foreign or domestic, doing business in this state, who are entrusted by such corporation with the authority of superintendence, control or command of other persons in the employ or service of such corporation, or with the authority to direct any employee, are vice-principals of such corporations, and are not fellow servants with such employees." Certainly Streetor was such a person as in the act described as a vice-principal, for he had either superintendence, control or command of the others, and the authority to direct them in their work.

This being true, it follows that there was no reversible error in the giving of the first, second and third instruction asked by the plaintiff, which in effect submitted the question to the jury on the evidence.

Quoting from the testimony of Streetor further: "I do not suppose I had finished my sentence [referring to his direction to Dalton to move so as to leave him room to jump as aforesaid] until Dalton said he would get off right away; and, just as he was getting off, the second car hit the semaphore pole, and the semaphore pole hit him. There didn't seem to be any time from the time he jumped until the pole struck him. It was all done in a second's notice. The front car had passed the pole. This was the car that the other was driven into [meaning the car that struck the pole]. The entire car had not passed [meaning, I presume, the front car.] It was the side of the second car that hit the pole. The second and first cars were telescoped into each other. [I presume the meaning is the first and second, counting as they would be going forward. They were now going backwards.] The first and second cars were not full length. We were only hauling

about 2½ cars by one being telescoped into the other; these cars were about the length of a car and a half. I don't remember whether they had four tracks or not. It was 15 feet back on the side of these cars that the pole was struck. The cars were kind of creaking, as any wrecked cars would do." On this and similar evidence on this point, the court gave the fourth instruction asked by the plaintiff, which reads as follows, viz.: "If the jury believe that at the time the deceased jumped from the car the appearances of danger to him were sufficient to justify a person of reasonable firmness and prudence in believing that his safety required him to jump from the car in order to escape the impending danger, then the fact that his death resulted from injuries received in making such jump will not defeat the plaintiff's right to recover in this action; and this is so notwithstanding that the jury may further believe that deceased might have escaped unhurt had he made no effort to leave said car." This instruction propounds a doctrine of universal application to cases of passengers, and has been recognized by this court, whenever necessary, to the exoneration of passengers from the charge of contributory negligence when acting in emergencies. *Railway Co.* v. *Murray*, 55 Ark. 248; *Railway Co.* v. *Maddry*, 57 Ark. 306.

So far as I have been able to ascertain, we have not been heretofore called upon to consider it as applied to employees' cases. It is evident that there is or may be a difference between the two classes of cases. A passenger, in his proper place on a train, is more or less helpless to protect himself from injuries resulting from the running of the train is somewhat at the mercy of the carrier, while the same is not usually true, not always true, at least, as to an employee, for he is a factor, or may be, in operating the train, and besides is by training and habit better able to protect himself than a passenger, and withal has by his contract assumed many risks that a passenger does not assume. Moreover, a carrier is bound to exercise the greatest care to protect a passenger, while a master is only required to exercise ordinary care to protect his servant. But, in cases where these differences do not intervene to affect the very right of them, then there does not seem to be any good reason in

making a substantially different rule in the one case from that applied in the other.

In other jurisdictions, the following statement is very generally supported as the proper rule, viz.: "While it is a general rule that the servant has no claim on the master for damages for an injury received by voluntarily assuming to do something which the master did not employ him to do, yet in the case of emergency he may, of his own volition, step outside of the line of his usual duties; and if this departure is only such as the necessities of the case fairly and reasonably call for, keeping in view the character of the work he is called upon to do, it will not of itself defeat a recovery of damages in case he is injured. Whether he is guilty of negligence is a question for the jury, and his conduct must be tried in the light of all the surroundings." *Barry* v. *Hannibal & St. Joseph Ry. Co.* 98 Mo. 62; *Smith* v. *W. & T. Ry. Co.* 41 Am. & Eng. Ry. Cases, 320; *Austin & N. W. Ry. Co.* v. *Beatty,* 73 Tex. 592; *Wynn* v. *Central Park, N. & E. Ry Co.* 133 N. Y. 375.

This rule is substantially the same as that of a passenger, where the servant is without fault; and the instruction under consideration is not erroneous, but substantially correct.

The deceased, like the foreman and probably the others of the crew, had grown somewhat nervous over the appearance of the wrecked cars, and began to be fearful of some injury from them, and on a suggestion from the foreman to move on his seat so as to make room for him (the foreman), as it might soon be necessary for him to do so, concluded that it was safer to get on the ground, did so, and was injured by an unforeseen occurrence. The jury had good ground to exonerate him from the charge of contributory negligence.

It is contended that the doctrine of "assumed risks" is to be applied to this case, and, when so applied, would defeat a recovery by the plaintiff. The doctrine of "assumed risks" may be thus epitomized, viz.: "*Where one voluntarily enters into a contract of hiring with a railroad company, he assumes all the risks and hazards ordinarily and usually incident to such employment, and will be presumed to have contracted with reference to such risks and hazards.*" But, while an employee as-

sumes all the risks incident to the service he enters, he does not assume a risk created by the negligent act of the master, and only such risks as he knows to exist or may know by ordinary care. It is unnecessary to cite authorities in support of these elementary propositions.

The sole question of any difficulty of solution in this case is therefore one of fact which the jury has settled; that is, whether or not the defendant, acting through its vice principal and representative, was guilty of negligence as charged in the complaint, and, if so, was that negligence the proximate cause of the death of Dalton. Some of us are of the opinion that the defendant did not exercise the necessary care in measuring the distance from the track to the point where the semaphore pole was erected, and that it was negligent in erecting the same so near to the track as that it was struck and knocked down by this car,—a fact of itself showing that it was too near, as it appears to them. Let that be as it may, the other act of negligence charged is more apparent, that is, the act of running these wrecked cars at the rate of five or six miles an hour, when it was a matter of apprehension to the foreman as well as to the deceased, and perhaps the others, that they were liable to collapse and fall upon them on the front platform at any moment. If there was apprehended danger of the wrecked cars falling towards the front, there was equal reason to apprehend that they would fall laterally or careen so much as possibly not to pass objects along the side of the track. The apprehension was felt in the one case the more sensibly because the personal safety of the parties was directly involved, but the apprehension of the danger of the wrecked car careening, although it did not develop altogether as apprehended, was nevertheless the moving cause of the deceased's jumping to the ground. Under the circumstances this could not be attributed to him as contributory negligence.

These are considerations that might reasonably have influenced the jury in arriving at their verdict. So that we do not feel authorized to disturb the verdict.

The judgment is therefore affirmed.

RIDDICK, J., dissenting.

BATTLE, J., absent.