MARSHALL v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAIL-
WAY COMPANY.

Opinion delivered March 17, 1906.

1.  EVIDENCE—RES GESTÆ.—Where a brakeman was injured while in the
discharge of his duties, so that he lived only a short while, his state-
ment as to how he received the injury was admissible as part of the
*res gestae.*  (Page 216.)

2.  RAILROAD—DUTY AS TO DISABLED CARS.—A railway company is bound
only to exercise due care, through its vice-principals and through a
proper system of timely inspection, to discover the disabled cars and
notify the trainmen of such condition; and when this is done, the risk
of handling such cars and carrying them to the repair shop becomes
one of the risks ordinarily incident to the employment, and is as-
sumed by the employee.  (Page 216.)

3.  SAME—RISKS ASSUMED BY BRAKEMAN.—Where a car is reported to
a brakeman as being in bad order, the burden of ascertaining the
defect and source of danger is cast upon and assumed by him.  (Page
218.)

4.  SAME—DUTY TO BRAKEMAN.—While a brakeman, engaged in handling
disabled cars, is deemed to have assumed the ordinary risks incident
to the performance of that duty, yet the same duty rests upon the
company and its vice-principals to commit no act of negligence whereby
he may suffer injury, and to exercise ordinary care to protect him from
danger, as would rest upon them while he is in the discharge of less
hazardous work.  (Page 219.)

Appeal from Lonoke Circuit Court; *George M. Chapline,*
Judge; affirmed.

*Marshall & Coffman,* for appellant; *Trimble & Robinson,*
of counsel.

The court erred in directing a verdict for the defendant. It
was a question for the jury. 130 U. S. 652; 152 U. S. 107; 149 U.
S. 44; 2 Labatt, M. & S. 2377-80; 1 *Ib.* 814; 39 Ark. 491; 62 Ark.
69; 63 Ark. 94; 66 Ark. 363; 70 Ark. 230; 71 Ark. 305; *Ib.* 445.
Failure to use due care to inspect the cars or to give notice of their
defects, and also permitting cinders and clinkers to accumulate on
the track, was actionable negligence. 71 Ark. 159; 70 Ark. 295;
57 Ark. 377; 1 Labatt, M. & S. 337, 340; *Ib.* 537-8. Notice
must be sufficient to enable the servant to protect himself. Am.
Dig. 1903 A, 2802 (Y); *Ib.* 2803 (Y Y); 21 So. 120; 76 Fed.
443. Risks arising from the master's negligence are not assumed

by the servant. 67 Ark. 209; 54 Ark. 389; 1 Labatt, M. & S. 620; 129 Fed. 347; 71 Ark. 446; 25 S. C. 158. Defendant could not shift the duty of inspection on to its employees by a rule. 48 Ark. 333, 347. The dangerous condition of the track was not of the obvious character to impute knowledge, as a matter of law, to a man engrossed in his work. 73 Pac. 880; 86 N. W. 838; Am. Dec. 720; 111 Ill. App. 473; 84 S. W. 679; 152 U. S. 107; 196 U. S. 51; 1 Labatt, M. & S. 1104-5; 1149-50; 1156-8, 1135, 1024-7. Whether the defective couplers and roadbed contributed proximately to the injury should have gone to the jury. 2 Labatt, M. & S. 2379; 4 Am. Rep. 181. See also 116 Fed. 867. Where there is evidence showing the master's actual knowledge of a defect, the case must go to the jury. 23 Atl. 843; 37 Atl. 619. It was not negligence *per se* for deceased to go between the cars, though they were equipped with automatic couplers. 56 N. W. 519; 103 N. W. 77; 87 N. W. 136; 119 Fed. 288; 4 Am. & Eng. Enc. Law (1 Ed.), 427-8; 1 Labatt, M. & S. 855-6; 35 So. 547; 131 N. E. 476. There was no rule forbidding employees from going between cars to couple them, and if there had been its customary nonobservance would relieve deceased of the charge of negligence in doing the work in that way. 74 S. W. 357; 1 Labatt, M. & S. 515; 69 S. W. 430; 77 N. W. 541; 51 N. W. 645; 92 N. W. 462; 84 S. W. 679; 100 Ala. 451; 1 Labatt, M. & S. 905-9.

*Oscar L. Miles,* for appellee.

1. The handling of "bad order" cars is a necessary incident of the service of trainmen. Deceased was charged with notice that the car was unfit for use, and that there was more than ordinary danger in attempting to handle it. Having an opportunity to know the danger and risk, he is presumed to know of such danger, and, if he failed to inform himself of it, he can not recover. 58 Ark. 125; 41 Ark. 542; 48 Ark. 333. He will be held to have assumed the greater risk attending the handling of disabled cars. 11 Am. & Eng. R. Cas., New Series, 410; 61 Ill. 130; 53 Tex. 434; 125 N. Y. 15; 16 Am. & Eng. R. Cas., New Series, 515.

2. By remaining between the cars at a time when it was unnecessary to do so, deceased was guilty of contributory negligence. "Safety Appliance Act," sec. 2; 63 S. W. 695; 70 S. W.

626; 18 Am. & Eng. R. Cas.; N. S., 551; 70 Ark. 606; 24 Penn. St. 469; 62 Ark. 245.

McCULLOCH, J.   Appellant, as administratrix of the estate of her deceased husband, C. R. Marshall, brought this action against appellee to recover damages by reason of his death. alleged to have been caused by the negligence of appellee. Deceased was a brakeman employed by appellee, and was killed by a train at Russellville, Ark., while he was coupling cars.   Negligence of appellee was alleged ·in allowing the roadbed to become covered with piles of clinkers and cinders, and in allowing a drawhead and coupler on one of the cars which deceased was attempting to couple to become defective, and in allowing a hinge of an apron attached to the car to become broken, none of which defects, it is alleged, deceased had notice of.   The answer denied all the allegations of negligence. and alleged contributory negligence on the part of deceased, and that his death resulted from an accident which was a part of the risk he assumed in his employment.

When the introduction of testimony was completed, the court instructed the jury to return a verdict for the defendant, which was done, and the plaintiff appealed.   The only question, therefore, presented is whether there was sufficient testimony, giving it the strongest probative force in support of plaintiff's alleged cause of action, to justify a verdict in her favor.

It is shown that deceased made three or four attempts to couple the cars, which were ineffectual on account of the failure of the coupler to work automatically.   He was killed in the. last attempt.   No defect in the coupler is shown to have existed, except that it was perhaps rusty, and the knuckle failed to open and close from the impact of the cars coming together.   Immediately after the accident it worked all right after being greased. The car which he was attempting to couple onto the train was a disabled dirt car which had been in use in the work of. re-constructing the roadbed.   On the end of the car was an iron apron about three feet wide, extending the full width of the car, which was attached to the car by large iron hinges. · The apron was arranged so that, when turned down in a horizontal position, it covered the space between that car and the next one, and enabled the plow to pass along unobstructed from car to car to expel the

loads of dirt.   One of the hinges on the apron was broken, and, when the apron was turned back, it protruded twelve inches, so one of the witnesses stated, over the end of the car.   Deceased, in attempting the last time to couple the cars, stepped out from between them, gave the signal to the engineer to back up, and walked back between the cars to adjust the knuckle of the coupler. He had his hand on the knuckle when the cars came together, and he attempted to jump out from between them, and was caught by the hinge, and fell between the ends of the couplings, and was hurt.   The hinge either pierced his body or his clothing. He lived only a very short while, and, when asked, after he partially revived from the shock, concerning the manner in which he received the injury, merely said, "The hinge."   There was sufficient evidence to have justified the jury in finding that the company was guilty of negligence in allowing piles of clinkers and cinders to accumulate along the track which might hinder the trainmen in handling and coupling cars, but there was no testimony tending to show that this contributed to the injury of appellant's intestate.   One witness stated that he was either "caught by something or stumbled," he did not pretend to know definitely which it was.   Two eyewitnesses introduced by plaintiff stated that he was caught by something and was thrown over between the ends of the couplings.   There can be no doubt, under the evidence, that he was caught by the hinge as he attempted to pass out from between the cars.   This was his own brief account of the accident, which was stated under circumstances which rendered it admissible as part of the *res gestae.* · So there was nothing to go to the jury on this charge of negligence.

The evidence was undisputed that the coupler was not in perfect working order, and that the hinge on the apron of the car was broken, either of which defects the jury might have found from the evidence contributed to the injury.   There was also sufficient evidence to warrant a finding that the car had not been inspected and notice given in the usual way of the defects.   But it does not follow from this that the servants of the company were negligent in this regard, or that the accident was not due to one of the risks which appellant's intestate assumed by virtue of his employment.   On the contrary, it is clear from the evidence that he had notice that the car was

disabled in some way, and that it was being coupled into the train for the purpose of carrying it to Van Buren for repairs. This train was made up at Russellville for a trip to Van Buren, and the conductor had orders from the office of the trainmaster to take up all bad-order dirt cars and all empty box-cars on the road between Russellville and Van Buren, and convey them to Van Buren for repairs. Deceased knew of this order, and assisted in locating the bad-order dirt cars (there being two of them) on the side track at Russellville. The conductor and one of the brakemen testified that deceased had the switch list containing the numbers of those cars, and that all three of them hunted up the cars and looked at them. In this way he received notice that they were disabled cars to be carried to the shop for repairs. It may be that he did not know of the projecting broken hinge before he was caught by it, though it is highly probable from the evidence that he did observe it. It was a defect easily discernible on casual observation of that end of the car, and the conductor testified that he and deceased examined the car together, and that the latter was bound to have seen it. But the company was not bound to give him specific notice of the defects. It was not customary to do so, and under the facts of this case it was not required in the exercise of due care. It was customary for the inspector merely to mark with chalk on the disabled car the letters "B. O.," meaning bad order. This was not done in this instance, and the jury would have been warranted in so finding, and that the inspector was guilty of negligence in failing so to do; but, as deceased received information of the same fact from another source, it can not be said that the negligence of the inspector contributed to the injury. In the operation of railroad trains, cars will necessarily become disabled, sometimes from ordinary wear of use and sometimes from unavoidable accident. They must then be conveyed to the shop for repairs, and it is the duty of the trainmen to do this. It is necessarily and unavoidably a part of the duties arising from their employment as train operatives, because the company obviously can not provide a repair shop wherever a car may become disabled, nor send out a special train and corps of men to bring in or repair every disabled car. It is only bound to exercise due care, through its vice-principals,

and through a proper system of timely inspection, to discover the disabled cars and notify the trainmen of such condition. When this is done, the risk of handling the cars and carrying them to the shop becomes one of the risks ordinarily incident to the employment, and is assumed by the employee. 1 Labatt, Master & Servant, § 268; Dresser on Employers' Liability, p. 409; 4 Thompson on Neg. § 4729; *Chesapeake & O. R. Co.* v. *Hennessy,* 96 Fed. 713; *Yeaton* v. *B. & L. Railroad,* 135 Mass. 418; *Judkins* v. *Railroad Co.,* 80 Me. 417; *Arnold* v. *D. & H. C. Co.,* 125 N. Y. 15; *Chicago & N. Ry. Co.* v. *Ward,* 61 Ill. 130; *Fraker* v. *St. P., M. & M. Ry. Co.,* 32 Minn. 54; *Kelly* v. *Chicago, St. P. M. & O. Ry. Co.,* 35 Minn. 490; *Flannagin* v. *Chicago & N. W. R. Co.* 50 Wis. 462; *Watson* v. *H. & T. C. Ry. Co.,* 58 Tex. 434; *Brown* v. *Chicago, etc., R. Co.,* 59 Kan. 70.

The doctrine applicable to the facts of this case is fully stated by the Supreme Court of Minnesota in *Kelly* v. *Chicago, St. P. M. & M. R. Co. supra,* as follows:

"The aspect of the case is, then, this: The plaintiff's intestate is notified generally that the car is in bad order, so that it has been necessary to withdraw it from ordinary service and lay it up for repairs. When he comes to handle it, he does so knowing that, for some reason not disclosed to him, it is not suitable for use in the ordinary way. Not knowing what, in particular, those reasons are, if he handles the car at all, he handles it as a car which is unsuitable for use, and at his own risk, not only for its defects— at least for such as are apparent to or would be fairly suggested by ordinarily diligent and careful observation, like those of the brake on this car. * * * The plaintiff's intestate must be taken to have assumed the risk of handling this car as one in bad order, which it therefore might be dangerous to handle in the ordinary way, and as to which, in the absence of any definite information as to the respect in which it was defective, the burden of ascertaining the defects and source of danger was cast upon and assumed by him. As he took this risk and burden upon himself, he can not hold the defendant responsible for it."

In *Chesapeake & O. R. Co.* v. *Hennessy, supra,* Judge Lurton, speaking for the court, said: "The rule is well settled that if the work of the employee consists, in whole or in part, in dealing with damaged or defective cars, and which, by the very

nature of his occupation, he must know, or have some reason to know, are unsafe and dangerous, he voluntarily assumes the risk and hazards which are incident to the duty he was engaged to perform. It is not a case where dangerous or defective instrumentalities are supplied by the master to be used in his work, and where notice of such danger should be given, but a case where the instrumentalities to be handled and worked with or upon are understood to involve peril and to demand unusual care. In such cases, the risk is assumed by the servant as within the terms of his contract, and compensated by his wages."

We do not mean to hold that because the servant is engaged in the hazardous work of handling disabled cars he is deemed to have assumed risks created by the negligence of the company or its vice-principals, or that the company is absolved from the exercise of due care to protect him. On the contrary, we say that whilst he is engaged in that work, though he is deemed to have assumed all the ordinary risks incident to the performance of that particular duty, yet the same duty rests upon the company and its vice-principals to commit no act of negligence whereby he may suffer injury, and to exercise ordinary care to protect him from danger, as while he is in the discharge of other and less hazardous work. The case of *St. Louis, I. M. & S. Ry. Co.* v. *Touhey,* 67 Ark. 209, is illustrative of the doctrine. In that case the servant was a member of a wrecking crew engaged in removing wrecked cars to the repair shops, and was injured by reason of the negligent acts of other employees of the company in moving the train to which the cars were attached at too rapid a speed. The court held that the company was liable for the negligence—that it was a risk which the servant had not assumed. But in the case at bar the servant knew that the car was disabled. It was a part of his duties to handle such cars, and, according to all the authorities on the subject, he must be deemed to have assumed, as one of the ordinary risks of his employment, the risk resulting from the disabled condition of the car.

This being true, the evidence did not justify a verdict in favor of the plaintiff, and the court properly instructed the jury to return a verdict for the defendant.

Affirmed.

RIDDICK, J., not participating.