ST. LOUIS SOUTHWESTERN RAILWAY COMPANY v. BRITTON.

Opinion Delivered February 24, 1913.

1. PRACTICE IN CIRCUIT COURTS—DIRECTING VERDICT OF JURY.—The circuit court is never justified in directing a verdict except in cases where, conceding the credibility of the witnesses for the plaintiff, and giving full effect to every legitimate inference that may be deduced from their testimony, it is plain that the plaintiff has not made out a case sufficient in law to entitle him to recover. (Page 169.)

2. PRACTICE IN CIRCUIT COURT—GRANTING A NEW TRIAL.—In passing upon a motion for a new trial on the ground that the evidence is not legally sufficient to sustain the verdict, the trial court is required to consider the element of improbability, and, if the trial judge is of the opinion that the verdict is clearly against the preponderance of the evidence, it is his duty to grant a new trial. (Page 170.)

3. PRACTICE IN THE SUPREME COURT—REVIEWS ONLY FOR ERRORS.—A verdict of a jury will not be disturbed on appeal if there was any substantial evidence to support it. The Supreme Court reviews only for errors, and will reject testimony only when it is contrary to the laws of nature, or is opposed to the physical facts in the case. (Page 170.)

4. WITNESSES—CREDIBILITY—QUESTION FOR JURY.—In an action against a railroad company for damages for personal injuries caused by a severe jar, and plaintiff testified that she was injured by a sudden checking of the speed of the train, thereby throwing her against the window sill, and all the other passengers and trainmen testified that there was no jar or jerk. *Held*, the testimony of plaintiff was a statement of fact, not in itself impossible or opposed to any natural law, and the credibility, force and effect of her testimony in this respect was for the jury. Under the Constitution of the State, the credibility of witnesses is for the jury. (Page 171.)

5. VERDICT—PERSONAL INJURY—PHYSICAL CONDITIONS.—In an action against a railroad company for damages for personal injuries, the plaintiff's testimony will not be held contrary to the physical facts, when she testifies that she was sitting sideways in a seat in a coach, that the train was stopped suddenly by the application of the brakes, and that she was thrown against the window sill, and it is for the jury to consider the action of the car, the life and movement of the person of the plaintiff in determining whether her testimony was in conflict with the physical facts. (Page 171.)

6. WITNESSES—CREDIBILITY—QUESTION FOR JURY.—Where there is an irreconcilable conflict in the testimony of physicians as to the cause of plaintiff's paralysis the question of the credibility of the witnesses is one solely to be determined by the jury. (Page 173.)

7. APPEAL AND ERROR—REFUSAL TO GIVE INSTRUCTION COVERED BY ANOTHER INSTRUCTION.—It is not error for the trial court to refuse to give an instruction asked by defendant, which is covered by another instruction given by the court at defendant's request. (Page 174.)

Appeal from Calhoun Circuit Court; *Geo. W. Hays,* Judge; affirmed.

### STATEMENT BY THE COURT.

Willa Britton instituted this action against the St. Louis Southwestern Railway Company to recover damages for personal injuries alleged to have been caused by the negligence of the railway company while she was riding as a passenger on one of its trains. She originally brought an action in the Federal court where there was a verdict and judgment in her favor. The Circuit Court of Appeals reversed the judgment on the ground that the testimony tending to support her cause of action was opposed to the physical facts. See *St. Louis Southwestern Ry. Co.* v. *Britton,* 190 Fed. 316. Upon the remand of the case the plaintiff took a non-suit and afterwards on the 11th day of December, 1911, commenced the present suit against the defendant railway company in the Calhoun circuit court, and a trial was had at the July term, 1912, of said court.

Willa Britton, for herself, testified substantially as follows: I am twenty-one years of age and live at Little

Rock, Arkansas. I am five feet and eight inches tall, and at the time I received the injuries complained of was perfectly well and weighed about one hundred and sixty-five pounds. I have had several operations performed. On June 27, 1907, I had a curettement done by Doctor Miller of Little Rock. On September 11, 1909, Doctor Ellis, of Chattanooga, Tennessee, removed a cyst off of my right ovary. The incision was made on the right side. I had been in good health after the curettment up to that time. I was in bed about two weeks from that operation. On the 13th of December, 1909, Doctor Ellis operated for appendicitis and my appendix was removed. In February, 1910, I came back to Little Rock and on the 18th of April following Doctor Miller operated on me for gall stones. He cut into my abdomen and found no gall stones, but said I had intestinal adhesions and that this was the cause of the pain in my right side. I had been up after this operation about eight weeks, when I took a trip to England, Arkansas. My wounds had healed entirely and except for the intestinal adhesions I was in perfect health. I suffered great pain from the adhesions, and Doctor Miller said they were caused from exercise. The pains would occur sometimes one in two or three weeks and sometimes two in one week. To alleviate my suffering they would give me hot baths, hypodermics of morphine and massages. When I went to England as above stated, I went out into the country to visit relatives and stayed three days. On the 11th day of July, 1910, I came to England and late in the afternoon boarded a train for Little Rock. I took passage in the rear coach and sat about the middle of the coach on the left-hand side of the aisle. On the right-hand side of the coach every seat was full of passengers and there was one on the left-hand side besides me. Two ladies were on board. The seats in the coach were cushioned seats and not chairs. Something like two miles out of England there was an accident. There was a terrible impact and it threw my body against the

window. I had a severe pain to strike me in the side and back. The train ran a little distance, then stopped and made another little jump. My side hurt me considerably and after a while got a little better. When the train came to a stop I walked to the water cooler and my side and back pained me severely. When I walked to the back end of the car I saw that the ties were broken for quite a distance back and could see where the wheels had cut into the ties. When the accident happened I was sitting on a seat facing the front of the car and looking out towards the aisle. The shutter to my window was broken and the sun was coming in the car. I shifted my position so that I was sitting near the center of the seat. I can not give the exact position, but know that I had my back towards the window so that the sun would not shine in my face, and I was looking at the scenery out of the window just in front of me on the opposite side of the car. The impact of the train threw my back and side against the window sill, which projected over the window I judge about three inches. (Here the witness indicates on the back of her counsel that part of her body and side which struck the window sill.) The window sill struck me on the left side. The accident happened about six o'clock in the afternoon. At the time I received the injury the train was "running along I suppose at the average rate of speed and all at once there was a lunge and it threw me against the window and I suffered severe pain. It was just for the distance the train run. It was just bounding and it was very rough."

After the train started again I was suffering very much and inquired if there was any doctor aboard the train. There was not. One of the ladies on the car bathed my face with water and did what she could for me. It was nearly eight o'clock in the evening when we reached Little Rock. When we arrived there the conductor and train auditor came to my seat. I put my arms around their shoulders and they supported me and carried me out of the car. I could make a step but was

suffering severely. They sat me down on the car steps and then got an invalid's chair and carried me into the station. They telegraphed for the company's physician and one of them came. He gave me a hypodermic of some kind. Later I was carried in an ambulance to the Physicians and Surgeons Hospital in Little Rock. One of the company's physicians directed a nurse to sit by me during the night and he also gave me another hypodermic. There was no examination of my back made until the next morning. On the morning of the 12th inst. Doctor Runyan examined my back and told me I had a very bad sprained back. He directed the nurse to rub it with liniment and strip with adhesive plasters across by back and side, that is, the left side where the injury was. He said it was swollen a little. Later in the morning Doctor Corney, who was a friend of mine, came in and examined my back. I have never been out of bed to walk around since I sustained the injury and have never walked a step since I went to bed in the hospital that night. For a few days I was able to turn myself in bed. Now I suffer excruciating pains along the waist line and in my back, side and spine, clear up to my neck. The pain goes clear into my head and my left side bothers me some. From the point where I was struck in the back down I am perfectly helpless. I have no sense of feeling whatever and can not use myself at all. I have no feeling in my lower extremities down to my toes. I can not control my urine and bowels and can not tell when they move. The day after the injury my back pained me severely and I suffered much with my side. The second day I could not have the pillow under my head. About the third day my limbs were numb and would go to sleep and were heavy for me to lift. About the 25th of July I could not move my limbs and had no sense of feeling so far as pinching myself was concerned. That was the first day I could not move myself. On the 2d day of August I was moved from the Physicians and Surgeons Hospital to St. Vincent's Hospital. Up to about two weeks after I was carried to St.

Vincent's I could still work my toes and then the paralysis was complete.  The paralysis first appeared in my left limb.  I could lift the right limb about a day longer than the left.  And about the same time I lost control of my urine and bowels.  I have suffered pain in my back from the day I was injured continuously until today.  Sometimes I suffer more than at others.  My appetite is poor and the pain keeps me from sleeping much.  I never had hysterics in my life.  After I looked at the track and saw the ties broken I did not go back to my seat and have a spell of hysteria.  Up to that time I had not suffered with any pains in my back and left side.  I was not quite sixteen years of age when I married.

I have had several operations performed on me, being the ones mentioned above.  My nurse has done everything advised by the physician to avoid bed sores, but I have three bed sores now, one on the right hip and two on the back.  Since I was hurt I have not been anywhere except in the hospitals, the court room at Little Rock and the court room here.  My limbs have wasted away and I would judge I weigh near one hundred pounds now.  If I was lifted up quickly it would cause me great pain in my back just at the waist line.  I was brought here on a cot from the hospital and suffered much on the way.  I can move the muscles in my shoulders and in my head and neck but I am not able to turn myself at all.  (The plaintiff here indicates the point on her body from which point down she says she is absolutely helpless.)  At the request of counsel for plaintiff the nurse sticks pins in the plaintiff's limbs, and counsel for the defendant objects, saying that they concede she is paralyzed.  Plaintiff testified that she did not feel the sticking of the pins in either of her limbs, which were exposed to the jury at the time the pins were stuck into them.

Miss Sallie Crow testified:  I commenced nursing the plaintiff in the early part of October, 1910.  She complained of a pain in the small of her back and thigh,

spinal column and head. She has complained of that ever since. I was with her six or seven weeks the first time and she suffered intense pain. I had to administer morphine hypodermics to alleviate her pain. At another time I nursed her about five weeks, and again two or three weeks. I have seen her practically every day since she has been in the hospital. I have never seen in her any evidences of nervousness or hysteria. My judgment is that she was suffering real pain. She suffered great pain on the train on her way down here yesterday. Her lower limbs are wholly paralyzed and she can not move them. She has no control over her urine and bowels and she does not know when her kidneys and bowels act. She has three bed sores, one on the right hip and two on the back. They have been there since last March. Doctor Carl Bentley is her physician.

Doctor Carl Bentley testified: The first time I examined the plaintiff she had just been brought to St. Vincent's Hospital in an ambulance and put in bed. The places at the point of injury on her back were covered with strips of adhesive plaster. They had been there for some time and I took them off. When I took the plasters off there was some swelling in the left side involving the spinal column. This suffering was of such a nature that it was difficult to tell positively but it felt like that there might be a slight displacement of one of the vertebrae that would be replaced in its natural position. The spinal column is composed of vertebrae which are connected by cartilage. They are formed so the body can be bent up and down at any angle. At the time I examined her first I found what seemed to be a slight displacement of one of the vertebrae at the point where the plaintiff said she was injured. There was not then a total paralysis of the lower limbs, and it would naturally follow that there was not a total lesion of the spinal cord at the point of the injury. Basing my opinion on the progress of the case, I think there is a permanent injury. The complete

paralysis as it now exists in plaintiff did not come for perhaps two months after it commenced. She can not now move her limbs and there is no sensation of pain in the limbs and body from the umbilicus down. If you move her limbs she will not have any sensation there but will complain of pain in her back at a place above the point of injury. The point of injury was just a little to the left of the median line. When she suffers intense paroxysms of pain we give her hypodermics of morphine which is the only thing that will ease her. During the paroxysms she has exhilarated heart action, and this indicates that she is suffering real pain. In my opinion she is suffering from paralysis resulting from a lesion of the spinal cord and not from hysteria. It is difficult to tell how long the plaintiff will live. She may die at any time, and I have known of cases where they lived twenty years or more. The doctor also testified that the plaintiff had developed bed sores, although he had taken every precaution to prevent it.

Doctor Corney also testified that he examined the plaintiff on the morning after she received her injury and found some contusions on her back, that is to say, a little enlargement of the back, some slight redness and bruised condition like she had been slapped or hit on the back. That the injury was on the left side of the small of the back between the lower dorsal and lumbar region. That he noticed no evidences of hysteria outside of the natural nervousness of a patient in her condition.

The evidence for the defendant is substantially as follows:

There were eight or nine passengers on the train the day the plaintiff claims to have received her injuries. All of them testified that the stopping of the train was not accompanied by any jar or jolt. That there was practically no jar, no more than there would be when at any ordinary stop a train pulls into a station. That they did not know that the trucks were off the track until after the train had stopped. One of the passengers

said that he was looking directly at the plaintiff at the time of her alleged injury and that she was not thrown back in her seat at all. Another passenger stated that he had an order pad on his knee and was copying his orders on the typewriter. That he felt no jar and did not stop writing. Still another witness says he was looking forward at the time and just before the train stopped and saw the plaintiff. He said that she was not thrown out of her seat in any way. The express and baggage man said that he was sitting on a sample trunk leaning against the partition of the coach. That he was writing up his way-bills and that the stop did not affect him any more than an ordinary stop at a station. On cross examination he stated that there was no side-swinging of the train for several hundred feet before the train got to the place where plaintiff said she was injured. He said that a train would naturally rock some, but that there was no hard swinging. That he noticed no lateral movement of the train and no jumping along there. That the stop was a gradual one, like stopping at a station.

Neither of the two lady passengers weighed as much as the plaintiff and both said that they noticed nothing unusual until the train stopped. That the train stopped just like it would stop for a station.

John Matz testified: I am foreman of the coach shops of the defendant company. I have made measurements of the car in which the plaintiff states she was injured. The window sill on the inside of the coach projected inside the car about five-sixteenths of an inch. It is half round, that is, oval on the inside. The top of the window ledge is nine inches above the seat on the front end and ten or ten and a half inches on the back. The back of the seat extends about twenty-six inches above the coach seat. The seats are nineteen inches in width and forty inches in length. There is a window to each seat.

John Lebosquet testified: I was conductor on the

train on the day plaintiff claims to have been injured. One pair of the front truck wheels of the tender got off the track. The engineer applied the emergency brake and stopped the train. There was no jar or jolting about it. The train was about three hundred and fifty feet long. The two truck wheels being off the rail had no effect whatever on the rear coach in which the plaintiff was sitting. The train had two coaches, a baggage car and engine and tender. There was no defect in the trucks. There was a low joint in the track there caused perhaps by the wet weather with the trains running back and forth over it. Some of the ties behind the train after it stopped were marked where the wheels had ran over them, but the track was all right. There might have been a half dozen broken ties here and there.

DeWitt Hope testified: I was engineer of the train on the day the plaintiff claims to have been injured. The front pair of wheels of the front trucks of the tender jumped the track about one mile south of Keo, and we ran about four hundred and fifty feet with that one pair of wheels off. After I discovered it we ran between three hundred and three hundred and fifty feet before we stopped. The train was equipped with Westinghouse air brakes and the coaches contained what we call a quick action tripple, and the engine was equipped with the same kind of brake, but not the same kind of tripple. A quick-action tripple will take hold at once. On that day the stop was not quicker than we make lots of other times but was a little quicker than we generally make at stations.

Cross Examination: The schedule time of the train was twenty-five miles per hour. You have to make thirty miles between stations to make the schedule. At the time of the accident I was going between sixteen and eighteen miles per hour. I did not think the track at that place was in condition to run any faster. It was in a rough but not dangerous condition. The conditions that caused me to go slow was on account of the water

over the fields and on both sides of the track that had been there and soaked in. The track was twenty inches above the water. I think the low joint and the water together caused the derailment. Where the wheels left the rail the track looked to be level but there was a swing that started the tender to rocking and there was a low joint there. You can not see the low joints until you hit them. The emergency brake is for a quick stop. I applied the emergency brake to stop the train on the day in question.

Doctors J. L. Green, J. P. Runyan, E. P. Bledsoe and W. H. Miller, all of whom are eminent physicians and surgeons, testified that they had examined the plaintiff. They admitted that she was paralyzed, as stated by her and her physician, but gave it as their unqualified opinion that the paralysis was caused by hysteria and was not due to a lesion of the spinal cord. They said that she had no bed sores on her and that these would naturally result if her spinal cord had been injured on the day in question. They detailed at length the scientific and physical tests that they made to detrmine whether her paralysis was caused by hysteria or by an injury to her spine, and, as above stated, testified that it was caused by hysteria. They stated that her injuries were not permanent, and that under proper treatment she would recover.

Doctor Runyan, one of the physicians for the defendant company, examined the plaintiff the next morning after the accident and says there was no injury to her spinal column.

Other evidence will be stated or referred to in the opinion. The jury returned a verdict for the plaintiff in the sum of twenty-five thousand dollars. The defendant filed a motion for a new trial and when it came on for hearing the court announced that he would grant the new trial unless the plaintiff entered a remittitur in the sum of twelve thousand five hundred dollars. The remittitur was entered and judgment was rendered in

favor of plaintiff in the sum of twelve thousand five hundred dollars.· The defendant has appealed.

*Sam H. West* and *Gaughan & Sifford,* for appellant.

1. Upon the facts presented in evidence the court should have instructed a verdict for the defendant. The decision of the Federal court upon the same facts presented here sustains our contention that the evidence is not legally sufficient to support a verdict in favor of appellee. 190 Fed. 316. See also 79 Ark. 622.

2. The court erred in refusing instruction 5, requested by appellant. If in stopping the train the resultant jar was the same as that resulting from the usual ordinary manner of stopping a train, appellant was without fault, hence not liable.

*Powell & Taylor* and *Davis & Pace,* for appellee.

1. There is sufficient substantial evidence to sustain the verdict. A verdict of a jury will not be disturbed even though this court may differ from the jury as to the preponderance of the evidence. 73 Ark. 383. The evi-. dence will be given the strongest probative force of which it is susceptible in determining whether there is substantial evidence to sustain the verdict. 76 Ark. 116; 79 Ark. 608; 3 Am. St. Rep. (Ind.), 630.

2. Instruction 5, requested by appellant, was properly refused. The proposition to be submitted was whether or not appellee was injured by the negligence of the appellant, and if, without fault on her part, she was so injured, appellant was liable, without reference to how great or little the jar was that brought about her injury. 79 S. W. 508.

Hart, J., (after stating the facts). The principal ground relied upon by counsel for appellant to reverse the judgment in this case is that the evidence is not legally sufficient to support the verdict, or to put it in a different form, that the court should have directed a verdict for the defendant. Under the provision of the Constitution that "judges shall not charge juries with regard to matters of fact but shall declare the law," it has been

repeatedly held that the circuit court has no power to determine the facts of the case and direct a verdict for either party, even though if returned for the opposite party it would set it aside as against the weight of the evidence. The only remedy in such cases is for the circuit court to promptly set aside verdicts that are clearly against the weight of the evidence. *L. R. & Ft. Smith Ry. Co.* v. *Henson,* 39 Ark. 413; *L. R. & Ft. Smith Ry. Co.* v. *Barker,* 39 Ark. 490. That is to say, it is the settled rule in this State that a court is never justified in directing a verdict except in cases where, conceding the credibility of the witnesses for the plaintiff and giving full effect to every legitimate inference that may be deduced from their testimony, it is plain that the plaintiff has not made out a case sufficient in law to entitle him to recover. In passing upon a motion for a new trial on the ground that the evidence is not legally sufficient to sustain the verdict, the trial court is required to consider the element of improbability and, if the trial judge should be of the opinion that the verdict is clearly against the preponderance of the evidence, it is his duty to grant a new trial. Not so with this court. It only reviews for errors. We can not reject testimony unless it is contrary to the laws of nature or is opposed to the physical facts in the case. It is a settled rule of this court that a verdict of a jury will not be disturbed on appeal if there was any substantial evidence to support it. The only difficulty is in the application of the rule to a given state of facts, and that is the close question in this case. In the instant case the plaintiff testified that the speed of the train was suddenly checked, and that she was thrown against the window sill of the car and that thereby her spine was injured. All the other passengers and the trainmen, as well, testified that the train stopped by slowing down gradually and that there was no jar or jerk. Two of the witnesses testified that they were writing and suffered no more inconvenience than they would have done if the train had been stopped in the regular way at a station. Another witness testified that he was looking directly at the

plaintiff and that she was not thrown or jostled in her seat. As far as the record discloses these witnesses had no interest in the case, were all credible persons and had no motive whatever to testify falsely. The strong probability then is that they were telling the truth. The plaintiff, however, testified that there was a jar, and that she was thrown from her seat. Her testimony in this regard is the statement of a fact, and is not contrary to the law of nature. She testified to a fact not in itself impossible, nor opposed to any natural law. Hence, the credibility, force and effect of her testimony in this respect was for the jury. The credibility of witnesses is the very matter which our Constitution says must be submitted to the jury.

It is insisted, however, by counsel for defendant that the physical situation as conclusively proved to exist at the time plaintiff claims to have received her injuries so clearly overcomes the testimony of plaintiff as to render it of so little probative force as not to create a conflict in the testimony for determination by the jury. This leads us to consider the physical situation as it was shown to exist.

The testimony of the plaintiff, viewed in the light most favorable to herself, was that she was a large woman, five feet eight inches in height, weighing about one hundred and sixty-five pounds. That she sat on a cushioned seat in the middle of the car. That the shutter of the window to her seat was broken so that the sun shone in upon her. That she was sitting facing the front of the car in the direction the train was going. That to avoid the sun she turned her head towards the aisle and was looking out of a window on the opposite side of the car at the scenery, at the time of the accident. The regular schedule of the train was twenty-five miles per hour and this, taking into consideration the time for stops at stations, required the engineer to make thirty miles per hour between stations. The condition of the road bed near the place of the alleged injury was such that the engineer deemed it prudent to check the speed

of his train, and the train was running at the rate of eighteen miles per hour when the derailment occurred. The water was standing over the fields at that point and stood within twenty inches of the top of the road bed. The road bed was not ballasted at that point and there was a low joint caused by the running of the trains over the soft road bed. This low joint in the opinion of the engineer was the cause of the derailment. Therefore, counsel for the defendant insist that, if the speed of the train had been checked suddenly the plaintiff would have been thrown forward and that her testimony to the effect that she was thrown against the window sill was in direct violation of a well known and established physical law. As above stated, in testing whether or not the court should have directed a verdict for the defendant, the evidence must be viewed in its most favorable light to the plaintiff. No accurate law of physics can be invoked to determine just how the plaintiff fell under the circumstances as detailed by her. The jury had a right to consider the action of the car, the life and movement of the person of the plaintiff in determining whether her testimony was in conflict with the physical facts. They were not required to judge the issue upon any rule which might be applied to an inanimate object.

The engineer testified that when he put on the emergency brake it would take the brake only a few seconds to take hold of the cars. That the air would cause the brake to take effect on the cars first and then travel towards the engine. The jury might have found that when the engineer applied the emergency brake on account of the road bed being softened by the water the side of the car next to the window sank down in the road bed lower than the opposite side. The engineer also testified that the road was rough and uneven. The jury might have found on this account and on account of the road bed being softened by the water standing around it that the cars did not run along smoothly, but that there would be more or less swaying from side to side. They might consider any involuntary movement of the plain-

tiff's body.   When all these matters are taken into consideration, we do not think it can be said that the plaintiff necessarily must have fallen forward and could not have fallen back against the window sill at the time and in the manner she claims in her testimony.

All of the eminent specialists placed on the stand by the defendant say that they have examined the plaintiff thoroughly and that she is suffering from paralysis caused by hysteria, and not by a lesion of the spinal cord. They detail at length the physical and scientific tests to which they subjected her and which they say conclusively demonstrates that her paralysis was caused by hysteria, and they state that her injuries are not permanent.   On the other hand, the physician who has attended the plaintiff for the most of the time since she received her alleged injuries testified in positive and direct terms that the paralysis was caused by an injury to the spine and that the plaintiff has never suffered from hysteria.   He gives at length the scientific and physical tests from which he says he has reached this conclusion.   He gives it as his opinion her injuries are permanent.   Here again we may not invade the province of the jury, and the question of the credibility of these witnesses was solely one to be determined by the jury.   Therefore, it can not be said, as a matter of law, that the verdict of the jury was without any substantial evidence to suppor it.   See, *Fidelity Casualty Co.* v. *Meyer,* 106 Ark. 91, 152 S. W. 995.   In reaching this conclusion we are not unmindful of the fact that the Court of Appeals reversed the judgment of the Federal court on the ground that the plaintiff's testimony was irreconcilable with the physical facts.

The testimony in the instant case, however, presents a different case to that passed upon by the Court of Appeals.   It appears from the record in the Court of Appeals that the plaintiff was sitting next to the aisle and the court laid stress upon the fact that if she had been suddenly thrown sidewise against the window sill she would not have been struck in the side and back below the ribs, but much higher up at or about the shoul-

ders.    The plaintiff says that she testified in the Federal court that she was sitting in the middle of the seat just as she did in the present case. She claims that the record of her testimony in the Court of Appeals was incorrect. But be that as it may, the jury heard her testimony and were the sole judges of her credibility and had the right to pass upon the discrepancies, if any, in her statements. Moreover, the condition of the road bed is gone into more in detail in the present case and the physical situation as it existed at the time of the accident is more particularly described, as far as we can tell by reading the opinion of that court.

Counsel for the defendant insist that the court erred in not giving instruction numbered five. In it the court was asked to tell the jury that if the jar which the plaintiff claims to have caused her injury was not greater than that caused by the train stopping at a station in the usual and customary manner the plaintiff could not recover. This proposition was fully covered by instruction numbered six, given for the defendant. In this the court told the jury that, in order to entitle the plaintiff to recover, she must have shown some unusual stopping of the train which caused her to be thrown violently against the edge of the window, striking her back and left side and from which her spinal cord was injured.

The instructions given by the court covered fully the respective theories of the parties to the suit, and the judgment will be affirmed.