St. Louis Southwestern Railway Company v. Ellenwood.

Opinion delivered April 24, 1916.

1. Appeal and Error—Ruling of Trial Court—Insufficient Evidence.—Where a trial court has overruled a motion for a new trial, based upon the insufficiency of the evidence, the verdict of the jury will be upheld on appeal, where there is any substantial evidence to support it.

2. Appeal and Error—Judicial Notice—Physical Facts.—Appellate courts take notice of the unquestioned laws of nature, of mathematics, of mechanics and of physics; and where by the application of such laws to the facts in evidence it is demonstrated beyond controversy that the verdict is based upon what is untrue and what can not be true, this court will declare as a matter of law that the testimony is not legally sufficient to warrant the verdict.

3. Negligence—Personal Injuries—Testimony of Plaintiff—Sufficiency.—Where a recovery, in an action growing out of personal injuries, was dependent upon the truth of the plaintiff's testimony, his testimony relating to matters, conditions and situations which might or might not have existed, and which was not contradicted by the physical facts, the evidence held sufficiently substantial to warrant a verdict in his favor.

4. Railroads—Injury to Yard-Man—Bad-Order Car—Notice.—A railway yard-man is not, as a matter of law, required to take notice that a certain car was a "bad-order car" because printed notices to that effect were tacked on each end of the sides of the car.

5. RAILROADS—INJURY TO YARD-MAN—NOTICE OF DANGER—BAD-ORDER CARS.—Plaintiff, a yard-man, employed by defendant railway, was injured by falling from the top of a freight car, caused by a hole in the roof of said car. *Held*, if a telegram was posted in the yard-master's office containing information that the train in question was a train of bad-order cars, and that if the plaintiff, before going on duty, failed to examine the telegram on file in his office, he is bound by the information imparted by the telegram and can not claim that he did not have notice of the nature of the train upon which he was injured.

6. DAMAGES—PERSONAL INJURY ACTION—AMOUNT.—Where plaintiff, an employee of a railway company, was injured by the negligence of the defendant, sustaining serious and permanent injuries, held under the evidence that a verdict awarding $20,000 damages, would not be disturbed on appeal.

7. TRIAL—MISCONDUCT OF JUROR.—A cause will not be reversed on the ground of the misconduct of certain jurors, where the same were treated to cigars and soft drinks, by plaintiff's counsel, during the progress of the trial, when the trial judge examined carefully into the matter, and found that no prejudice resulted to the defendant from the conduct of the jurors.

Appeal from Dallas Circuit Court; *Turner Butler,* Judge; affirmed.

*Edw. A. Haid, A. L. Burford, F. G. Bridges* and *W. T. Wooldridge,* for appellant.

1. Under the Federal Employer's Liability Act, as construed by the courts, under the evidence there is no liability:

(1) Because no negligence was proven.

(2) Because appellee assumed the risk.

The car was a *bad order* car. 233 U. S. 492, 501-3; 92 Atl. 1060; 144 Pac. 762; 118 Ark. 304; 177 S. W. 875; 95 Ark. 562; 167 S. W. 128; 125 *Id.* 1056; 58 Tex. 434; 135 Mass. 418; 61 Ill. 131; 59 Kans. 72; 144 Pac. 763; 76 Ark. 69; 7 N. W. 337; 179 U. S. 658; 211 *Id.* 459; 29 N. W. 173; 44 S. E. 709; 96 Fed. 713; 169 *Id.* 557; 105 S. W. 747; 65 Fed. 48; 67 *Id.* 507, 510; 14 Atl. 735; 119 Tenn. 401; 104 S. W. 1088.

2. It was error to give appellee's instructions 1, 2, 3 and 4 and to refuse appellant's instructions 4, 6. 7, 11 and 13.

3. The cause should be reversed for improper conduct of appellee's attorney. 6 Ark. 537; 104 *Id.* 616; 40 S. W. 352; 11 Ga. 203; 17 *Id.* 364; 34 *Id.* 379; 12 Ill. 531; 12 Kans. 539; 36 N. W. 583; 11 N. W. 668; 45 Fed. 542; 55 S. E. 216; 95 Pac. 540; 53 So. 803; 164 S. W. 1036; 147 N. W. 566; 113 Pac. 186.

4. The judgment is excessive.

*W. D. Jackson, Pace, Seawell & Davis,* for appellee.

1. The evidence is sufficient to sustain the verdict. There was negligence and appellee did not assume the risk. 78 Ark. 213; 17 *Id.* 209; 198 Fed. 1; 98 Ark. 145; 77 *Id.* 367; 79 *Id.* 53; 232 U. S. 94; 169 Fed. 567; 191 U. S. 64; 187 Fed. 949; 67 Ark. 217; 92 *Id.* 560; 87 *Id.* 443; 82 *Id.* 11; 179 Fed. 801; Sher. & Redf. on Negl. (4 ed.), § 198; 196 U. S. 51; Cyc. 1140; 1156-7, 1168, 1275.

2. There was no error in the instructions. 201 Fed. 56; 235 U. S. 376; 238 *Id.* 507; 232 *Id.* 94; 89 Ark. 424; 93 *Id.* 564; 92 *Id.* 102.

3. There was no improper conduct of either the jurors or attorneys. 104 Ark. 622; 238 U. S. 507; 26 Ark. 323, 334; 20 *Id.* 36; 34 *Id.* 341; 40 *Id.* 454; 66 *Id.* 545; 32 Oh. St. 328; 50 Atl. 217; 34 Iowa 41; 38 N. E. 136; 4 Pac. 977; 105 Mo. 24; 49 Kans. 643; 237 Ill. 148; 68 Miss. 432; 57 S. W. 52.

4. The verdict was not excessive.

Hart, J.   W. C. Ellenwood sued the St. Louis Southwestern Railway Company to recover damages for personal injuries which he alleges he sustained by reason of the negligence of the railway company while in its employment as yard master. The defendant denied liability upon the ground that it was not guilty of negligence and that the plaintiff assumed the risk.

The issues were tried before a jury which returned a verdict for the plaintiff. From the judgment rendered the defendant has appealed. The material facts relating to the happening of the accident are as follows:

The plaintiff was severely injured on the night of December 21, 1914, by falling or being thrown from the

roof of a car in a train which was being stored on a side track in defendant's yards in the city of Pine Bluff, Arkansas. The plaintiff was thirty-nine years old and had been engaged in railroad work practically ever since he was twelve years of age. He started as call boy and worked in that position for about eight years. He then became a brakeman and served in that capacity until the latter part of the year 1897. Since that time he had been serving as yard master and conductor. He had been working as night yard master for defendant for about ten months when he was injured.

The repair shops of the defendant were situated at Pine Bluff and the yards there were about four miles long. The yards contained a number of tracks upon which trains are received and are made up and sent out of the yards. The yards also contained tracks on which cars are stored. The cars that are sent in to be repaired are usually stored on what are called rip-tracks. It is the duty of the yard master to receive trains and store them on the various tracks in the yards and to make up trains that are made up at Pine Bluff. At the time the plaintiff was injured he went to work at seven o'clock in the evening and quit at seven o'clock in the morning. The yard master had an office in the yard and when the day yard master went off duty, he left a train card which advised the night yard master of the condition of the tracks in the yards. There was also posted in the office a "line up" which gave the number of the regular trains, the time of the extra trains, the direction and time of arrival of the trains. This "line-up" gave no idea of the character of the trains or what they contained. This information is obtained from the manifest or consist. The consist gave information which showed the class of loads in the train, where they were going, their tonnage, whether empties, bad-order or good-order cars. Bad-order cars were usually noted "B. O. Shops," which meant they were bad-order cars to go to the shops. When a train of empties was to arrive ordinarily the message would sim-

ply contain the number of the train and the number of empty cars in it.

On the night of the injury the plaintiff said he went to the office of the yard master and examined the clips posted there and that there was nothing in them advising him that a bad-order train was due to arrive that night. He went on out in the yard to work as there were a great many trains coming in that night, and while out there received information that train number 500 consisting of about ninety empty cars was due to arrive at 11 p. m.; that this information was delivered to him in the yards by the train dispatcher but he was not advised that it was a bad-order train; that it was the duty of the dispatcher to notify him if there were bad-order cars in the train; that the only information he had was that it was a train of empties, consisting of about ninety cars; that about twelve o'clock he received information that extra train number 500 would be in ahead of number 15 or right behind it; that the dispatcher gave him this information; that as soon as he received this information, he went to the north end of the yards to receive the trains which were coming while he was talking to the dispatcher; that it was about two o'clock at night; that it was dark, cold and sleeting some; that he went out and personally headed the trains in on track number 3 and told them to double back on the Dewey track; that he meant by this for them to store all the cars on number 3 that it would hold and take the rest to the Dewey track; that track number 3 would hold about sixty of the cars; that when he told them to go to the Dewey track he was asked by one of the train crew, "Where is the Dewey? That he got on the train to show them where the Dewey track was and that he intended to get down and ride back when he was sure they were back in on the Dewey track; that he started to get down off of the cars and while doing so looked around and saw that there was no one there to take care of the cars and there not being much time, he went on top and began to signal the engineer to slow down; that he saw that he must ride on the rear end

of the cars because there was no one else to do so; that he walked to the second car to the rear and was still giving the slow signal, the last signal that is given before the signal is given to stop; that the track was a little rough and the motion of the car made him mis-step from the running board to the side of the car; that as he made the step he saw that there was a plank off of the roof; that he tried to over-step the hole caused by the missing plank and fell off. He supposed he over-stepped the hole and slipped and fell off of the car; that he does not remember where he fell, but does remember trying to catch his feet as he stepped over the hole.

Other witnesses for the plaintiff testified that two boards were gone off the top of the car near the center and that two were off at the end of the car and that the end crown moulding was gone; that under the boards was the tin roof of the car and that this tin roof was four or five inches below the boards that were gone; that this would make a hole there from four to six inches deep extending from the running board to the outer edge of the car. The plaintiff and other employees of the company for him testified that when a car was in this condition that it was customary to temporarily repair the roof, or upon a failure to do that, to rail the running board of the car with 2x4 pieces.

On the part of the defendant it was shown by several witnesses who worked in the yards that they knew that extra train number 500 was a bad-order train and was due to arrive some time during the night; that it consisted of about ninety cars and that most of them were bad-order cars; that the car upon which the plaintiff was walking when he was injured was a bad-order car and was so marked on each side of it; that the board on each side of the car contained the words "B. O. Pine Bluff Shops," printed on the opposite corners of it; that there was also marked in yellow chalk, which would not wash out by rain, the words "B. O. Rip." This mark meant bad-order, rip track or repair track. The printed letters on

the board were about one inch and one half letters and the boards were fastened on the side of each end of the car by being nailed. The letters meant bad-order and the car was being billed to Pine Bluff shops.

W. P. Turner a switchman testified, that he knew that extra number 500 was a bad-order train; that it was supposed to arrive before twelve o'clock but did not come in until about two o'clock A. M.; that plaintiff told him at two different times about this train and knew that it was a bad-order train.

J. C. Larew the day yard master testified, that there was on file in his office a telegram showing that extra number 500 was a bad-order train at the time the plaintiff went on duty on the night he was injured; that this telegram was placed by him on the file in the yard master's office; that it was there when he went off duty at seven o'clock in the evening and was still on file when he returned at seven o'clock the next morning; that he had a conversation with plaintiff after he was hurt and that plaintiff admitted to him that he knew extra number 500 was a bad-order train.

After he was injured, plaintiff signed a statement detailing the manner in which he got hurt. He detailed the circumstances substantially as they appear in his testimony and in this statement he refers to the fact that the Dewey track was the only available place for bad-order cars without interfering with the fruit extra and number 15.

It is also shown by the defendant that the "line up" posted in the yard master's office gave the information as to whether or not a train contained bad-order cars. It was shown that the train in question contained about ninety cars, and that most of them were bad-order cars. It is also shown by the defendant that the running board of cars which were no more defective than the one on which plaintiff was injured were not protected by railing on each side of it.

The day yard master and others testified that the company had bad-order cars coming in every day and that many of them came in with one or two planks off of the roof and the tin roof still underneath and in such cases it was not the custom to rail the running board.

The plaintiff in rebuttal denied that he told Larew, after he got hurt that the train from which he fell was a bad-order train; that he only told Larew the reason why he got on the cut of cars; that he did not tell Turner at any time that he was expecting a bad-order train that night; that he did not discuss with other employees as stated by them that he was expecting a bad-order train that night.

It is earnestly insisted by counsel for the defendant that the evidence is not sufficient to support the verdict.

(1)   In view of the testimony in this case, once more we will take occasion to point out the distinction between the rules which govern trial courts and this court with respect to setting aside verdicts.  This court has repeatedly declared the rule to be that where the trial court has overruled a motion for a new trial based upon the insufficiency of the evidence and where there is any substantial evidence to support it the verdict of a jury will be upheld on appeal.  The reason for the rule is, first that the jury have weighed the evidence and found the verdict; second that the circuit judge who also heard the testimony from the mouths of witnesses and weighed the same has by overruling the motion for a new trial, given the approval of his legal judgment to the verdict; third, this court cannot have the benefit of seeing and hearing the witnesses and observing the peculiarity of their expressions while testifying, but only has the opportunity generally to read the substance of their testimony.  Therefore the court has repeatedly declared the law to be that if after a consideration of all the evidence, the trial court is of the opinion that the verdict of the jury was contrary to the weight of the evidence, it is the duty of that court to set aside the verdict. This distinction

has been uniformly made. *St. L. Sw. Ry. Co.* v. *Britton,* 107 Ark. 158; *McDonnell* v. *St. L. Sw. Ry. Co.,* 98 Ark. 334; *Blackwood* v. *Eads,* 98 Ark. 304; *Richardson* v. *State,* 47 Ark. 567; *Catlett* v. *Railway Co.,* 57 Ark. 461. So under the settled rules of this court we must uphold a verdict on appeal if there is any substantial evidence to support it.

(2-3)    Appellate courts take notice of the unquestioned laws of nature, of mathematics, of mechanics and of physics. So where there are undisputed facts shown in the evidence, and by applying to them the well known laws of nature, of mathematics and the like, it is demonstrated beyond controversy that the verdict is based upon what is untrue and what cannot be true, this court will declare as a matter of law that the testimony is not legally sufficient to warrant the verdict. In the case at bar the conditions surrounding the plaintiff, as testified to by the defendant's witnesses, furnish a very strong argument against the credibility of his testimony, but this is as far as the record authorizes us to go. It can not be said that the testimony of the plaintiff is contradicted by the physical facts or is opposed to any unquestioned law of nature. His testimony related to matters, situations and conditions which might or might not have existed, and his right to recover depended wholly upon the truth or falsity of his testimony. His testimony was, therefore. evidence of a substantial character and if believed by the jury, was sufficient to warrant a recovery in this case.

According to the testimony of the other employees of the defendant who worked in the switch yard, bad-order cars came into the yards every day and it was the duty of the plaintiff to handle them. They said they all knew that the train in question was composed mostly of bad-order cars and they thought that the plaintiff also knew of this fact. The defendant's yard master says, there was on file a telegram in his office stating that the train in question was a train containing bad-order cars and that this telegram was on file when the plaintiff went on duty;

that it was the duty of the plaintiff to have read the tele-
grams on file and to take notice of the information con-
tained therein.  Besides this, printed notices with letters
to the effect that the car in question was a bad-order car,
were tacked at each end of the sides of the car.  So it
seems probable that the plaintiff had notice that this
was a train composed mostly of bad-order cars.  How-
ever, the plaintiff flatly contradicted all this testimony
and stated positively that no telegram was on file when
he went on duty informing him that the train in question
contained bad-order cars.  He said the first information
he had about the train was that the train dispatcher
telephoned to him out in the yards that the train was due
about 11 o'clock P. M. and said that it was a train of
empty cars.  He denied in positive terms that he had any
knowledge whatever that the train contained bad-order
cars.  He said that it was customary for the train dis-
patcher to notify him when such was the fact, that in-
formation that a train of empty cars was coming in was
not information that the cars were bad-order cars.  There
were other cars on the Dewey track and the plaintiff got
on top of the cars in question to prevent them from
bumping into the cars already on the Dewey track.  He
did this because there was no brakeman on the cars and
it was therefore a part of his duties to go upon the cars
and prevent them striking those already on the track.
When the cars reached an uneven place on the track,
they jostled to such an extent that one of his feet was
thrown from the running board and that as he went to
catch himself on the side of the top of the car, he saw the
defective flooring of the roof and in attempting to step
over the hole, he fell and was thrown from the car and
severely injured.  It was raining or sleeting at the time
and the accident happened in a very natural manner.
Under all the circumstances it can not be said that the
testimony was not legally sufficient to warrant the verdict.

As we have already seen, according to the plaintiff's
testimony, it was the custom of the defendant to protect
bad-order cars like the one in question when being trans-

ported from one terminal to another by placing a railing around the running board on the roof or by temporarily repairing the roof so that there would be no missing planks in it. On the other hand, the defendant adduced evidence tending to show that this was never done in cars in no worse repair than the one in question; that the custom in case of cars containing no worse defects than the one in question was to nail boards on each end of the side of the car with printed letters indicating that the car was a bad-order car. The respective theories of both parties in this respect were submitted to the jury under appropriate instructions prepared by their respective attorneys.

At the request of the plaintiff the court gave the following instruction: "While the servant assumes all the ordinary risks incident to his employment, yet a duty rests upon the company to commit no act of negligence whereby he may suffer injury, and to exercise ordinary care to protect him from danger, and in this case, if you believe from a preponderance of the evidence that plaintiff was in the employ of the defendant, St. Louis Southwestern Railway Company, and engaged in the performance of his duty, riding upon a freight car, in the yards of the company, at Pine Bluff, Ark., and that there was a hole in the roof of said car, and that while upon the top of said car the plaintiff stepped into the hole in the roof of said car, and was thrown from said car to the ground, and was thereby injured, and that the defendant railway company knew of the condition of the roof of said car, and that the condition of the same was unknown to the plaintiff, and if you find that the company thereby failed to exercise ordinary care to protect plaintiff from danger, and that its act in leaving said hole in the roof of said car thus exposed, was the proximate cause of the injury, and that plaintiff at the time was exercising ordinary care for his own safety, and had not assumed the risk, you will be authorized to find for the plaintiff and assess his damages at such a sum as you may find from the evidence will compensate him for the injuries received."

(4)   Counsel for defendant say that the car had been inspected and found to be in bad order on account of a defect in the roof, and for this reason was being sent to the shops at Pine Bluff or repairs.   They contended that the instruction in effect tells the jury that if they found the defendant knew of the condition of the roof and that the same was unknown to the plaintiff, they might find for the plaintiff regardless of the fact that it was a bad-order car and was designated by the customary marks, and of plaintiff's knowledge of the character of the car. We can not agree with counsel in this contention.   We do not think it can be said as matter of law that plaintiff must take notice that it was a bad-order car because printed notices to that effect were tacked on each end of the side of the car.   In *Marshall* v. *St. Louis, I. M. & S. Ry. Co.,* 78 Ark. 213, the court held that where a car is reported to a brakeman as being in bad order the burden of ascertaining the defect and source of danger is cast upon and assumed by him.   It is well known that cars are frequently damaged and they become defective by use. This may occur on any part of the line of road and it then becomes necessary to carry them to the shop for repairs.   This duty necessarily devolves upon the crew operating the trains and the dangers of moving the car from one point to another is one of the perils of the business assumed by the train crew when they are hired.   So it may be said that the purpose of posting notices indicating that the cars are defective is to give the train crew the general knowledge that the cars are out of repair and to warn them to look out for defects.

(5)   We do not think, however, that this rule would apply to a person working in the yards.   It is true it is the duty of the switchmen to store bad-order trains on the repair tracks and to take bad-order cars out of a train and place them on the repair tracks, but this duty is required to be performed hurriedly and the switchmen do not have time to examine the cars for defects.   On this account the rules of the company provide that the train dispatcher's office shall give them notice in advance of

trains containing bad-order cars. The instruction in question submitted to the jury, the negligence of the defendant, the contributory negligence of the plaintiff, and the question of assumed risk. In the case of *K. C. S. R. Co.* v. *Livesay,* 118 Ark. 304, the court, following a decision of the Supreme Court of the United States, held that the defense of assumed risk was not abolished by the Federal Employers' Liability Act. We do not deem it necessary to set out all the instructions or to comment upon them at length. It is sufficient to say that the court fully and completely submitted the respective theories of the parties to the jury. It told the jury that if a telegram was posted in the yardmaster's office containing information that the train in question was a train of bad-order cars, and that the plaintiff before going on duty failed to examine the telegram on file in his office, he is bound by the information imparted by the telegram and can not claim that he did not have notice of extra train No. 500 and its contents.

(6) It is also contended that the verdict is excessive. The jury returned a verdict for $20,000. The plaintiff was injured on the night of the 21st day of December, 1914, and the trial was commenced on June 25, 1915. The plaintiff testified that on account of his injury some of his teeth were knocked out and loose; that his nose was broken or dislocated; that his head, shoulders and elbows were bruised; that his hand, and also three ribs, were broken; that there was a black and blue place on his stomach; that he was paralyzed and unable to move himself at all; that he had no use of his limbs and has lost all sexual desires; that he has no sensation in his body and can not stick his tongue out of his mouth; and suffers excruciating pain; that he is unable to control his urine; that soon after he received his injuries he went to Memphis and was treated by Dr. C. E. Duvall; that his doctor bill amounted to $1,400; that he was earning $130 per month at the time he received his injuries and was a stout able-bodied man. At the time plaintiff received his injuries he weighed 200 pounds and at the time of the trial,

six or seven months afterward, he weighed from 135 to 140 pounds.

Dr. C. E. Duvall, a graduate of a regular school of medicine and surgery, testified: I began to treat the plaintiff some time in April, 1915. I found plaintiff complained of considerable pain in his head. He complained of pain most of the way from his head to the length of his spine. He was unable to stand. His speech was somewhat impaired; his power to swallow wasn't normal; found him with paralysis of the left side and partial paralysis of the right side; and mostly total loss of feeling of the skin; also noted a depression in the spine near the middle of the back or lumbar region; also a depression in the skull in the back of the head. Plaintiff was unable to move his left arm and left leg, and had no sense of feeling in either. In order to test plaintiff's sensation in his left leg and arm, I used the test used in all cases, which consisted of a sharp-pointed instrument or needle which I used when the plaintiff was not expecting me to do so. I would make the test while I engaged plaintiff in conversation and when plaintiff was unawares. Plaintiff gave no evidence of sensation. I repeated the test several times. Plaintiff's right leg was partially paralyzed and is more so now than when I first examined him. He has also the same loss of sensation in the right leg that he has in the left. I used the recognized treatment for conditions found in plaintiff, such as nerve tonics, stimulants and electric treatment. Plaintiff's condition is worse now (the time of the trial) than it was when I first saw plaintiff in April. Plaintiff has been gradually growing worse. In my judgment, plaintiff weighs less; from his general appearance he is more emaciated; his muscular tissue has become more flabby and plaintiff looks smaller than he did two months ago. From examination and treatment of plaintiff, thought he was paralyzed, which I thought was due to an injury to the spinal cord. I believed the spinal cord was injured. Plaintiff's injury is permanent. I do not think plaintiff has any chance for recovery. There was a dribbling of plaintiff's

urine and he seems to have no control of it. I examined testicles and they were considerably atrophied. They have gotten much smaller, especially the right one.

Dr. Carle Bentley also examined the plaintiff and in the main corroborated Doctor Duvall as to his condition. Both of the physicians testified that his injuries were permanent. On the other hand, the plaintiff was examined by two physicians at the request of the defendant and they both said that his injuries were not permanent. They stated that his paralysis was caused from hysteria and was only temporary. Here again, however, we can not invade the province of the jury, and the testimony of the witnesses for the plaintiff warranted the jury in finding for him in the sum of $20,000.

(7) Counsel for defendant, also, ask that the judgment be reversed because of the alleged misconduct of two of the jurors. It appears that the jurors were permitted to separate while the trial was in progress. G. W. Mann, one of the jurors, while walking down the street met Wallace Davis, one of the plaintiff's attorneys, and one John Harris, who testified that he had no connection with the case. Harris proposed that they go in a drug store and get a soft drink of some kind. They all three went in and took a drink of grape juice or coca cola. According to the testimony of Mann, Harris paid for the drinks. Other witnesses said Davis paid for them. Davis denied this, and said Harris asked him to buy some cigars after they had taken the drinks. Davis refused, saying, "No, I won't buy a cigar, because Mr. Mann is a juror and I want to get away from him as quick as possible." Davis said that Mann then turned and walked out of the drug store.

It was also shown that Paul Matlock, another of plaintiff's attorneys, treated William Scarborough, a juror, to a cigar. Matlock testified that he was going in the drug store to get himself a cigar and met the juror, who was a fellow-townsman. That he gave him a cigar as an act of courtesy as he had done before and had no thought of influencing the verdict, and did not think his

conduct was so understood by the juror.   The juror cor-roborated his statement.   It was shown that both the jurors were men of standing in the community, and they stated that their verdict was in no wise affected by what occurred.   The court examined at length the jurors, at-torneys and other witnesses present, and found that noth-ing was done to prejudice the rights of the defendant. The circuit court found that the acts in question were not done for the purpose of influencing the minds of the ju-rors and did not have that effect.   In the case of *Brook-haven Lumber & Mfg. Co.* v. *Illinois Cent. Rd. Co.,* 68 Miss. 432, the court held that where the trial court has in-vestigated a charge of misconduct on the part of a juror, and where, upon the evidence, it can not be said that the verdict rests under any suspicion of having been obtained by improper influence, the action of the court in refusing to set aside the verdict will not be disturbed on appeal. The court said:   "While it can not be too strongly in-sisted that the stream of justice shall be kept pure—so pure as to afford no suspicion of corrupt or improper in-termingling of any foreign or hurtful matter, yet it must not be forgotten that no mere irregularities of behavior in this day of greater and wiser freedom for jurors, at least in civil trials, will be permitted to disturb the stabil-ity of judicial proceedings."

This court has made substantially the same holding as the Supreme Court of Mississippi.   *Bealmear* v. *State,* 104 Ark. 616.

We have carefully examined the record, and, finding no prejudicial errros in it, the judgment will be affirmed.