PAYNE *v.* COTNER.

Opinion delivered May 2, 1921.

1. COMMERCE—CATTLE INSPECTION LAWS.—The Federal act requiring the inspection of cattle shipped in interstate commerce for fever ticks, and the isolation of those infected with such ticks in separate pens (U. S. Comp. Stat., §§ 850, 8690-97), is valid.

2. CARRIERS — CATTLE INFECTION — JURY QUESTION.—In an action against a carrier for damages resulting from delay in delivery of a shipment of cattle caused by their detention at destination on account of having fever ticks, testimony of plaintiff tending to prove that the cattle were free from ticks when shipped tends to contradict the testimony of the United States inspector that he found a fever tick on a cow on arrival of shipment, and hence the evidence as to finding the tick is not undisputed so as to take the question from the jury.

3. EVIDENCE—JUDICIAL NOTICE—LAWS OF NATURE.—Appellate courts will take judicial notice of a law of nature, such as that it takes two weeks for an adult cattle tick to develop, and that the development must take place on the animal.

4. CARRIERS—CATTLE INFECTION—EVIDENCE.—In an action against a carrier for damages caused by detention of cattle in quarantine, evidence *held* to establish that, if a cow was infected with cattle ticks as claimed by a United States inspector, the cow was not free from ticks when received for shipment.

5. CARRIERS—LIABILITY FOR MISTAKE OF INSPECTOR.—A railroad company is bound by the rules and regulations of the interstate shipment of cattle promulgated by the Secretary of Agriculture, and can not be held liable in damages resulting from delay in de-

livering the cattle at destination due to mistake of a United States inspector in quarantining cattle on arrival of the shipment, in the absence of fraud or collusion on the company's part.

Appeal from Logan Circuit Court, Southern District; *James Cochran*, Judge; reversed.

### STATEMENT OF FACTS.

On July 7, 1918, appellees delivered at the railroad station at Booneville, Arkansas, forty-one head of cattle consigned to the National Live Stock Commission Company at Kansas City, Mo. Appellees received a through bill of lading, and the shipment was routed over the lines of the Chicago, Rock Island & Pacific Ry. Co. to Howe, Okla., and from there over the line of the Kansas City Southern Ry. Co. to Kansas City, Mo. When they reached their destination the live stock inspector for the Bureau of Animal Industry ordered the car unloaded in quarantine pens because one of the cows had fever ticks on her. This affected the price of the cattle, and appellees had to sell them at a loss. They brought this suit against the appellant to recover damages.

Appellees were witnesses for themselves. According to their testimony, they were engaged in the live stock business near Booneville, Ark., and on July 7, 1918, they delivered to the railroad company, at its station, forty-one head of cattle to be shipped to Kansas City, Mo., and received a through bill of lading therefor. The animals had been thoroughly dipped as required by the regulations of the United States Government and were free from ticks. Appellees in all respects complied with the regulations for dipping cattle and examined them and saw that they were free from ticks at the time they were delivered to the railroad company for shipment.

Logan County, Ark., had been pronounced clean territory and free from ticks, by the government authorities, although a few cattle ticks would be discovered in that territory from time to time. Because the United States inspector claimed to have discovered a cattle tick on one of the cows shipped, he required the shipment of

cattle to be placed in quarantine and on that account appellees received less for the cattle than they would have received had the cattle been unloaded in pens used for receiving clean cattle, or cattle free from ticks.

Joseph Burns, was a witness for appellant. In July, 1918, he was live stock inspector for the Bureau of Animal Industry in the employment of the United States and was stationed at Kansas City, Mo. He was known as a lay inspector and his duties were to inspect cattle, hogs and sheep when they were unloaded at the chutes by the railroad company. He had a civil service appointment under the United States Government and had been engaged in this work for nearly six years. He had received training for the work under a veterinary specialist. He inspected the car of cattle in question before allowing the cattle to be unloaded at the chutes and found live Texas fever ticks on one cow. The cattle had been shipped as clean cattle, but he required them to be unloaded in the quarantine pens on account of discovering the ticks on the cow. If the cattle had been clean cattle or free from ticks, Burns would not have required them to be unloaded in quarantine pens.

E. J. Carey, a veterinary inspector under the United States Bureau of Animal Industry, had supervision over the Kansas City Stock Yards in July, 1918, and had been engaged in work of that character for twenty years. During all of this time he had been an employee of the United States in this kind of work. George Burns was an inspector under him at Kansas City, Mo., in July, 1918. About the 7th or 8th of July, 1918, Burns brought the witness a tick which he reported he had gotten off of a cow in the shipment of cattle involved in this lawsuit. Carey placed the tick in a bottle and had it present at the trial. The tick could not have gotten on the cow between the 6th of July, 1918, and the time it was taken off on the 9th day of July, 1918. The reason is because the Texas fever tick has to go through stages of development on the animal. It does not develop on the ground when it is hatched. After it gets on an animal it takes two weeks to

develop to the size of the tick referred to. A tick goes through two molts. The seed tick gets on the animal and it takes fifteen days to get through its first molt. In other words, it sheds its skin and it takes from five to eight days to go through its second molt. After it has matured on one cow, it can not become detached and attach itself to another animal. The reason is that when the Texas fever tick becomes attached to an animal it can not come off of the animal until it reaches maturity and is gorged with blood so that it lets loose of its own accord. The tick in question had been at least two weeks on the animal upon which it was found.

Other expert witnesses corroborated the testimony of Dr. Carey in respect to the development of the Texas cattle tick.

The jury returned a verdict for appellees and to reverse the judgment rendered, appellant has duly prosecuted this appeal.

*Thos. S. Buzbee* and *George B. Pugh,* for appellant.

1. A verdict should have been directed for appellant under the undisputed evidence.

2. The undisputed evidence shows that an adult cattle tick could not have gotten on one of the cows between the date of the shipment and the date of the arrival of the cattle, only three days en route. The court erred in giving instruction No. 1 for appellees and in refusing No. 2 for appellant. 75 Atl. 352; 26 L. R. A. (N. S.) 712; 57 Ark. 402.

3. No evidence of negligence on the part of the carrier was shown, but the evidence shows due care and absence of negligence and no liability whatever. 112 Ark. 298-300. The question of negligence should at least have been submitted to the jury as requested by appellant.

*Evans & Evans,* for appellees.

1. This court will take judicial knowledge of the rules and regulations of the United States Secretary of Agriculture and Bureau of Animal Industry. Sapps' Federal Rules and Reg., pp. 19-20.

The court properly refused to direct a verdict for appellant. If Carey and Driver are experts, their testimony can not have any more force than the testimony of any other expert opinion witness. 50 Ark. 511. The jury are not bound to accept the conclusion of experts. The testimony of scientific witnesses is not always reliable, and at last the jury are the judges of the facts. There was no basis for the testimony of the experts, Carey or Driver. Under the law and evidence there was no error in refusing to direct a verdict against plaintiff. 105 Ark. 526.

2. The verdict is supported by a clear preponderance of the testimony. 119 Ark. 6. A verdict is final on review or appeal. 89 Ark. 111; 110 *Id.* 632; 1 Crawford's Digest, 297.

3. There is no error in the instructions; they state the law. 110 Ark. 269; 139 *Id.* 143; 100 *Id.* 269; 81 *Id.* 469; 112 *Id.* 298.

HART, J. (after stating the facts). Under the act of Congress regulating the shipment of live stock from one State to another, the Secretary of Agriculture is authorized to establish rules and regulations concerning the exportation and transportation of live stock from one State to another where he may have reason to believe certain contagious diseases exist.

Pursuant to this authority the United States Bureau of Animal Industry appointed an inspector with supervision over the Kansas City Stock Yards at Kansas City, Mo. His duties required him to inspect all cattle from southern points before they were unloaded and to place cattle which were clean and free from ticks in certain pens and those infected with fever ticks in other pens. Such laws are valid. *K. C. S. Ry. Co.* v. *State,* 90 Ark. 343, and *Reid* v. *Colorado,* 187 U. S. 137.

Pursuant to the authority conferred by the act of Congress, the shipment of cattle in question was inspected when it arrived at Kansas City. Burns testified that he found a Texas fever tick on one of the cows and on that

account had the cattle unloaded in quarantine. On this account appellees sold the cattle at a loss. Hence this lawsuit.

Counsel contend that a verdict should have been directed in appellant's favor under the undisputed evidence. Of course, if the undisputed evidence showed that a cattle tick was found on one of the cows and did not get on the cow en route, appellant would not be liable because the cattle were placed in quarantine pursuant to an act of Congress.

In the first place, it is contended by counsel for appellant that the undisputed evidence shows that a cattle tick was found on one of the cows upon the arrival of the consignment at the chutes. They point to the fact that the United States inspector testified to that fact, that he is a disinterested witness, and that there is nothing in his testimony which tends to contradict him. This is true, but that does not make his testimony uncontradicted. The cattle were shipped from clean territory and were billed as clean cattle. Appellees testified that they had dipped the cattle strictly according to regulations before they were shipped; that they examined them carefully at the time of shipment, and that they were free from ticks. This testimony tends to contradict the testimony of Burns, the United States inspector. *Mo. Pac. Rd. Co.* v. *Block,* 142 Ark. 127.

Again it is contended by counsel for appellant that the judgment must be reversed because the undisputed evidence shows that an adult cattle tick could not have gotten on one of the cows between the date of shipment and the date of the arrival of the cattle at Kansas City, Mo. The cattle were only three days en route.

In this contention we think they are correct. In *St. Louis S. W. Ry. Co.* v. *Ellenwood,* 123 Ark. 428, the court held that appellate courts will take notice of the unquestioned laws of nature, of mathematics and the like. In the application of that rule to the facts of the present case, the court will take notice of the unquestioned laws of science. Dr. Carey testified, without objection, that

the inspector delivered to him an adult cattle tick which he had taken from one of the cows of appellees at the stock yards before he allowed the car of cattle to be unloaded. So it may be taken as established that an adult cattle tick was found on the shipment of cattle in question by the United States inspector. The expert witnesses testified that it would take two weeks for the tick to have developed. They point out that the tick only develops while on the animal. Thus it will be seen that it is a scientific fact that it takes two weeks for an adult cattle tick to be developed and that the development must take place on the animal. Therefore, the undisputed evidence shows that if an adult cattle tick was found upon the animal by the inspector, it could not have gotten on the animal en route.

Counsel for appellees insist that the laws of science sometimes change. It is sufficient answer to this to say that in this respect the law has not yet been questioned and is a scientific fact. The expert witnesses all agree that it is impossible as a scientific fact for a seed tick to develop into an adult tick in less than two weeks and that the molting process must take place on the animal. Therefore, the undisputed evidence shows that, if the tick was on the animal, it was there before the cattle were delivered to the railroad company for shipment, and the railroad company was not guilty of any negligence in the premises while the cattle were in its possession for shipment and delivery to the consignee. Liability then could only be predicated on the theory that the cattle were free from ticks when they were received for shipment. As we have already seen, the testimony of the United States inspector to the effect that he found a cattle tick on one of the cows at the unloading of the chute in Kansas City is not undisputed, but it does not follow that the railroad company would be liable on that account. While the testimony in this respect is not undisputed, still there is nothing to show that the railroad company acted in collusion with him in the premises. In the absence of such a showing, the railroad company would not be liable.

The railroad company was bound by the rules and regulations promulgated by the Secretary of Agriculture, and it could not be held liable in damages for a mistake of one of the inspectors of the United States in the absence of fraud and collusion on the part of the railroad company.

There is nothing in the record tending in the remotest degree to establish this charge. Indeed the evidence shows the utmost good faith on the part of the railroad company.

It follows that the judgment must be reversed and the cause remanded for a new trial.